IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN GREGORY REILLY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:05-CV-1162-K |
| | § | |
| CAPGEMINI AMERICA, INC. AND | § | |
| CAPGEMINI ENERGY LP, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendants' Motion for Summary Judgment, filed July 28, 2006. With leave of court, Defendants supplemented their summary judgment motion on November 14, 2006. After review and consideration of the motion, response, reply, summary judgment evidence, pleadings on file in this case, and the applicable law, the court has determined that Reilly has not sufficiently raised a genuine issue of material fact on his retaliation claim, because he has not shown that he engaged in protected activity. Therefore, Defendants' Motion for Summary Judgment is **granted.**

### I.   Factual and Procedural Background

Plaintiff John Gregory Reilly ("Reilly") was formerly employed by TXU Corp. ("TXU"). He began his employment with a predecessor to TXU in 1987, and worked in various positions with TXU until June 2004. From 1988 through 2001, Reilly worked primarily in TXU's customer operations and procurement/supply-chain areas.

1

In February 2001, Reilly took on the job of Sourcing Coordinator with TXU, working with the IT and procurement departments. In 2002, TXU's Procurement Services Department was reorganized, and Reilly moved into the Strategic Sourcing Group, where he remained until June 2004. His last job title with TXU was Senior Strategic Sourcing Representative, reporting to Kevin Quilliams ("Quilliams") and Matthew Worth ("Worth").

Sometime in 2004, TXU decided to outsource a number of the functions being performed by its employees. To do so, Capgemini Energy LP ("CGE") was formed as a completely new and separate entity. CGE's purpose was to provide outsourcing services to both TXU and other businesses in the field of energy generation and delivery. TXU and CGE entered into a Master Services Agreement (the "MSA"), which governed the relationship of the two entities and defined what functions would be performed by CGE and what functions TXU would retain. Due to this outsourcing initiative, TXU laid off thousands of employees, who were all offered employment with CGE. These employees, including Reilly, were laid off from TXU on June 30, 2004, and began employment with CGE the next day, July 1, 2004.

As part of the MSA, CGE agreed to pay certain severance benefits to transitioned TXU employees whose employment was terminated by TXU within 18 months of their date of employment with CGE. This severance was jointly funded by TXU and CGE, to be paid upon an employee's termination from CGE. To be eligible for this severance, transitioned employees had to sign a release of their claims against TXU (the "TXU

2

release"). However, their employment with CGE was not contingent upon signing the TXU release. TXU was required to notify CGE of each transitioned employee who executed the TXU release, so that CGE would know who was eligible for the severance if they were laid off by CGE within their first 18 months of employment with CGE.

Reilly was informed in May 2004 that he was one of the TXU employees who would be affected by TXU's outsourcing strategy. In connection with his layoff, Reilly received a severance offer from TXU that required him to sign the TXU release. Reilly was given 45 days to consider the severance offer and sign the release, but he did not accept TXU's severance offer by July 2, 2004, the deadline for doing so, and did not sign the TXU release.

Under the MSA, CGE did not perform the strategic sourcing function for TXU, although TXU transitioned all of its Strategic Sourcing Group personnel (including Reilly) to CGE. Therefore, although these TXU employees transitioned to CGE, their jobs and responsibilities did not transition to CGE. Besides Reilly, other Strategic Sourcing Group employees who transitioned to CGE included Robert Aaron ("Aaron"), Maxie Brewington ("Brewington"), and Paul Dickens ("Dickens"). Because there was no strategic sourcing work for Reilly, Aaron, Brewington and Dickens to perform upon their transition to CGE, these employees were placed in CGE's Supply Chain Service Line, a group that primarily performed purchasing functions for TXU. This group was headed by Laura Powell ("Powell"). Reilly was the only former TXU employee in the Supply Chain Service Line who had not signed the TXU release.

3


Initially, CGE was focused on organizing itself, and during July and August 2004, Reilly worked on special projects assigned by Powell and Jim Breland ("Breland"). In August 2004, Powell decided to organize the Supply Chain Service Line by placing its employees into different portfolios or groups that had responsibility for procurement of particular types of goods or services or other specific procurement function. Reilly was assigned to the IT Portfolio, which was responsible for the procurement of IT goods and services, because he had some IT procurement experience at TXU. Therefore, beginning in mid-September 2004, Reilly's primary duties and responsibilities were his duties as part of the IT Portfolio team. In this position, he reported directly to Bob Gentry ("Gentry"). Gentry did not have IT experience (procurement or otherwise), and Powell considered his assignment as the leader of the IT Portfolio team to be temporary, and hoped to find someone else who could eventually assume that team leader position.

To make the MSA economically feasible for CGE, CGE had to significantly reduce the costs of performing the services outsourced by TXU. As part of this cost-reduction effort, Powell needed to reduce costs in the Supply Chain Service Line by 20%. To do so, Powell had to reduce 23 employees from the Supply Chain Service Line. Because their functions were never transitioned from TXU, Reilly, Aaron and Brewington were considered early on as possible candidates for a reduction in force.

In the late summer and early fall of 2004, the Supply Chain Service Line managers (Gentry, Breland, and Fred Stobaugh ("Stobaugh") ) and Kathy Gutierrez of CGE's Human Resources department held a series of meetings to determine which employees in

4

the Supply Chain Service Line would be reduced. They did so by evaluating and ranking the Supply Chain Service Line Employees based upon a set of criteria established by CGE management. Through this process, Reilly was ranked near the bottom of the group of Supply Chain Service Line employees. Whether an employee had or had not signed the TXU release was not discussed during the ranking meetings, and was not part of CGE's criteria for ranking employees. Although CGE's human resources personnel knew which employees had or had not signed the TXU release, they did not share this information with the managers who rated and ranked the employees. However, at some point after he joined CGE, Gentry heard from another Supply Chain Service Line employee that Reilly had not signed the TXU release.

Although Powell supervised the ranking process by dropping in on the meetings to ensure that they were going well, and to assist in obtaining clarification regarding the process where needed, she testified that she did not know the affected employees well and did not personally rate or rank any of the employees. Powell, Gentry and Breland also examined whether the managers' recommendations for terminations would change in light of each employee's portfolio assignments. The portfolio assignments did not cause the recommendations for termination to change. The Supply Chain Service Line managers made recommendations to Powell as to which employees should be retained or terminated. As Reilly states in his response, these ratings and rankings were the "determining factor" in the decision to terminate his employment. (Plaintiff's Brief at 15). Although Powell had the final decision making authority, she ultimately accepted the managers'

5

recommendations, including their recommendation to terminate Reilly.  CGE began laying off employees on October 27, 2004.  Twenty-three employees in the Supply Chain Service Line were terminated in the first round of reductions, including Reilly.  Powell testified that she selected Reilly for the first round of reductions due to the fact that CGE was not performing the strategic sourcing function, his low rank from the Supply Chain Service Line managers, and the need to eliminate twenty-three employees in the initial round of reductions.  For similar reasons, Powell also chose to eliminate Aaron and Brewington at the same time.  Out of the twenty-three Supply Chain Service Line employees who were reduced by CGE in late October 2004, Reilly was the only one who had not signed the TXU release.  The other twenty-two employees who were terminated had signed the TXU release.  Reilly was informed of his termination on October 27, 2004.  His discharge was effective on November 10, 2004.

After Reilly left CGE, his duties were distributed to other Supply Chain Service Line employees.  Then, Paul Head ("Head") joined the IT Portfolio of the Supply Chain Service Line in January 2005.  Head had been part of CGE's separate IT Service Line.  Head had previously been performing a procurement function in the IT Service Line.  It is undisputed that Head left his employment with CGE in early 2006.

Reilly sued TXU on January 12, 2005, bringing claims of discrimination and retaliation under 42 U.S.C. § 1981 (*see* Civil Action No. 3:05-CV-0081-R) (the "TXU case").  In that case, TXU moved for summary judgment, in part based upon its contention that Reilly's decision not to sign the TXU release did not constitute protected

6

activity, a required element of his retaliation claim. In September 2006, Senior Judge Buchmeyer of this court granted summary judgment, holding (in relevant part) that failure to sign the TXU release was not protected activity, thus TXU was entitled to summary dismissal of Reilly's retaliation claim (*see* Memorandum Opinion and Order entered in Civil Action No. 3:05-CV-0081-R, Docket No. 75).

Reilly filed the instant lawsuit on June 6, 2005, claiming that CGE and Capgemini America, Inc. ("Capgemini America") retaliated against him for declining to sign the TXU release, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.,* the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and 42 U.S.C. § 1981. CGE and Capgemini America now move for summary judgment on all of Reilly's retaliation claims.

### II.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551 (1986). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-25, 106 S.Ct. at 2551-54. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion with summary

7

judgment evidence showing the existence of a genuine fact issue for trial. *Id.* at 321-25, 106 S.Ct. at 2551-54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

### III.     Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment, arguing that Reilly cannot present a material issue of fact on his retaliation claims because he cannot establish a *prima facie* case of retaliation, and cannot show that Defendants' legitimate, non-discriminatory reasons for his termination are a pretext for retaliation. Further, Defendant Capgemini America contends that it is entitled to summary judgment on the additional basis that it was not Reilly's employer.

#### A.     Standards for Retaliation Claims

Reilly brings his retaliation claims under Title VII, the ADA, the ADEA, and 42 U.S.C. § 1981. The same standard of proof applies to retaliation claims brought under each of these statutes. To show unlawful retaliation, a plaintiff must establish a *prima facie* case of 1) engagement in an activity protected by the relevant statute; 2) an adverse employment action; and 3) a causal connection between the protected act and the adverse action. *See Harvill v Westward Communications, L.L.C.,* 433 F.3d 428, 439 (5th Cir. 2005) (Title VII); *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 319 (5th Cir. 2004) (Title VII and section 1981); *Holtzclaw v. DSC Communications Corp.,* 255 F.3d 254, 259 (5th Cir.

2001) (ADEA); *Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999) (ADA). Once the plaintiff has done so, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If such a reason is advanced, the plaintiff then must adduce sufficient evidence that the employer's proffered reason is a pretext for retaliation. *Id.*

### B. Analysis of Reilly's Retaliation Claims

Because the same legal standard applies to all of Reilly's retaliation claims, the court will consider them simultaneously.

#### 1. Reilly's *Prima Facie* Case

In their Motion for Summary Judgment, Defendants first argue that Reilly cannot establish his *prima facie* case of retaliation because he cannot show that he engaged in protected activity, and because Judge Buchmeyer's ruling that his decision not to sign the TXU release was not protected activity precludes relitigation of that issue here.

##### a. Protected Activity

As Defendants state in their brief, an employee engages in protected activity by either opposing a practice made unlawful by the statute ("opposition clause"), or participating in enforcement of the statute ("participation clause"). In support of their position, Defendants cite case law stating that the failure to sign a release is not protected activity as contemplated by the relevant statutes. *See Reilly v. TXU Corp.,* 2006 WL 2586818, *14-15 (N.D. Tex. 2006) (plaintiff's failure to sign release was not protected activity where plaintiff did not inform employer his reason for not signing it); *Cox v. City*

9

*of Houston,* 2005 WL 2086166, *3 (S.D. Tex. 2005) (plaintiff's decision not to sign a release was not protected activity); *Bottge v. Suburban Propane,* 77 F. Supp.2d 310, 313 (N.D.N.Y. 1999) (declining to sign a waiver of rights is not protected activity and alone does not represent an objection to discrimination; there must be "some indicia" in declining to sign that plaintiff is making a complaint). Reilly has not cited any decisions stating the opposite - that merely refusing to sign a release, without informing the employer of his intent to pursue a discrimination claim, rises to the level of protected activity under the statutes. *See also Maldonado v. Southwestern Bell Telephone, L.P.,* 2006 WL 3147419, *4 (W.D. Tex. 2006) (plaintiff did not engage in protected activity when he declined offer to release claims in exchange for reinstatement); *Snoke v. Staff Leasing, Inc.,* 43 F. Supp.2d 1317, 1328 (M.D. Fla. 1998) (refusal to sign release of claims was not protected activity).

In his response, Reilly clarifies that he is only relying on the participation clause, and not the opposition clause, to support his retaliation claims. (Plaintiff's Brief at 29). Reilly further argues that by not signing the TXU release, he engaged in activity protected by the participation clause. The court disagrees, and finds that the factual record does not support Reilly, as he has presented no evidence on summary judgment showing that he informed TXU (or either Defendant herein) that he did not sign the TXU release because he intended to bring a discrimination claim against TXU.

In *Croushorn v. Bd. of Trustees of Univ. Of Tenn.,* a case relied upon by both parties, the court stated that the lack of a pending, formal charge at the time of the retaliation does

10

not necessarily defeat the plaintiff's claim. 518 F. Supp. 9, 22 (M.D. Tenn. 1980). However, the court distinguished a situation such as Reilly's, where the employee's intent to file a charge is "inchoate and unarticulated" at the time of the alleged retaliation, from that where even though the charge is yet to be filed, the plaintiff's employer *already knows* that the employee intends to file a charge when the retaliatory act is carried out. *Id.* (Emphasis added). Here, Defendants were not informed (either formally or informally) that Reilly intended to sue TXU for racial discrimination. For this reason, the court finds that Reilly has failed to raise a material issue of fact regarding the first element of his *prima facie* case of retaliation.

b.   **Collateral Estoppel**

In further support of their motion, Defendants argue that Reilly also cannot establish his *prima facie* case because Judge Buchmeyer has previously ruled that his failure to sign the TXU release is not protected activity. Therefore, Defendants contend that the doctrine of collateral estoppel applies to preclude relitigation of that issue here. In response, Reilly argues that he should not be collaterally estopped from pursuing his retaliation claim because he believes that the issues and facts that apply to the instant case are different from those in the TXU case, that the issues related to his retaliation claim in the TXU case have not been fully litigated there, that the issues decided by Judge Buchmeyer were not "critical and necessary" to the TXU case, and that "special circumstances" are present that would render the application of collateral estoppel inappropriate or unfair here.

11

Under the doctrine of collateral estoppel, a prior judgment is preclusive in federal court if 1) the prior federal decision resulted in a judgment on the merits; 2) the same fact issue was litigated in that court; and 3) the issue's disposition was necessary to the prior action's outcome. *Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 284 (5th Cir. 2006); *Am. Home Assurance Co. v. Chevron, USA, Inc.,* 400 F.3d 265, 272 (5th Cir. 2005). Further, there must not be any special circumstances making application of collateral estoppel unfair. *Fin. Acquisition Partners,* 440 F.3d at 284, *citing Winters v. Diamond Shamrock Chem. Co.,* 149 F.3d 387, 391 (5th Cir. 1998), *cert. denied,* 526 U.S. 1034 (1999). Finally, collateral estoppel does not apply unless the facts and legal standards applied to evaluate those facts are the same in both proceedings. *Id., citing Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1422 (5th Cir. 1995). Having examined these considerations in the context of this case, the court concludes that collateral estoppel does apply here to preclude Reilly from establishing his *prima facie* case of retaliation.

First, the TXU case did proceed to a judgment on the merits. Judge Buchmeyer determined that summary dismissal of Reilly's retaliation claim against TXU was warranted, and entered judgment against Reilly and in favor of TXU. Although Reilly argues that the decision in the TXU case is not final because it is being appealed, his appeal does not alter or suspend the preclusive effect of that judgment. *Prager v. El Paso Natl. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969); *Deere & Co. v. Johnson,* 2003 WL 21196191, *2 (5th Cir. 2003); *Timmons v. Special Ins. Svcs.,* 984 F. Supp. 997, 1008 (E.D. Tex. 1997), *aff'd,* 167 F.3d 537 (5th Cir. 1998). A judgment is still valid, even if pending

on appeal. *Timmons,* 984 F. Supp. at 1008, *citing Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir. 1994).

Turning to the next factor, the court finds that the same fact issue is presented both here and in the TXU case – whether Reilly's failure to sign the TXU release was protected activity. Both of Reilly's retaliation claims are based upon this same factual premise. To resolve Reilly's retaliation claim in the TXU case, Judge Buchmeyer specifically determined that because Reilly informed no one at TXU, CGE or Capgemini America that he intended to bring a discrimination claim against TXU, Reilly did not engage in protected activity when he did not sign the TXU release. *Reilly v. TXU Corp.,* 2006 WL 2586816 at *14. Additionally, the court finds that the third factor establishing collateral estoppel has also been met, because the element of protected activity is a necessary part of a retaliation claim. *Harvill,* 433 F.3d at 439; *Davis,* 383 F.3d at 319. Thus, the determination of this issue was necessary to the outcome of Reilly's case against TXU.

For these reasons, the court must apply the doctrine of collateral estoppel here. Possible additional considerations such as circumstances that would make the application of collateral estoppel unfair, or differing facts or legal standards between the two separate actions, do not derail this conclusion. Although Reilly lists a number of other considerations in a summary fashion, he provides no meaningful analysis as to how they actually do permit him to avoid the collateral estoppel effect of the judgment in the TXU case. Further, as the court has discussed above, the same facts and legal standards apply to Reilly's retaliation claims against TXU, CGE and Capgemini America.

13

Finally, Reilly argues that under a recent Supreme Court case, failing to sign a release of claims could be construed as protected activity, citing *Burlington Northern & Santa Fe Railway Co. v. White,* 126 S.Ct. 2405 (2006). The court disagrees that the *Burlington Northern* decision impacts its analysis of Reilly's retaliation claim here. First, it is distinguishable on its facts, as the plaintiff in *Burlington Northern* had actually engaged in protected activity by filing an EEOC charge. *Id.* at 2409. Secondly, the Court's analysis and holding in *Burlington Northern* focuses on the *employer's* actions, not the action of an employee who engages in protected activity, and whether those actions by an employer could be considered a materially adverse employment decision that could underpin a retaliation claim. *Id.* at 2410-18. This is the second, not the first prong of Reilly's *prima facie* case of retaliation. *Harvill,* 433 F.3d at 439. Here, the parties do not dispute that Reilly's discharge is a materially adverse employment action, which was the law both before and after the *Burlington Northern* decision was issued. *See, e.g., Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004) (adverse employment actions include discharge); *Ramirez v. Gonzales,* 2007 WL 329207, *5 (5th Cir. 2007) (plaintiff experienced an adverse employment action when she was terminated).

Finally, as the court has stated above, evidence that an employee refused to sign a release without the "crucial evidence" that the employer knew he did not sign it because he intended to pursue discrimination claims will not satisfy the "protected activity" prong of a retaliation claim. *Reilly,* 2006 WL 2586816 at *14. Accordingly, for all of these reasons, *Burlington Northern* does not support Reilly's position that he has satisfied the

14

"protected activity" requirement of his *prima facie* case by failing to sign the TXU release, without informing anyone at TXU, CGE or CapGemini America that he intended to sue TXU for discrimination. The collateral estoppel effect of Reilly's prior case against TXU precludes him from establishing his *prima facie* case of retaliation.

### c.     Causal Connection

In addition to the lack of protected activity, Defendants also contend that Reilly cannot set forth sufficient proof of the third element of his *prima facie* case – a causal connection between his alleged protected activity and the decision to discharge him. Defendants have set forth summary judgment proof showing that whether or not an employee had signed the TXU release was not a factor considered by those making either the recommendation or final decision regarding those employees selected for layoff in October 2004. They have further shown that other employees who did sign the TXU release were also selected for termination at the same time as Reilly. In response, Reilly relies on Gentry's testimony that he had heard Reilly did not sign the TXU release. That evidence alone is insufficient to raise a fact issue regarding causal connection or any retaliatory intent by Gentry, because the record also shows that Reilly's reasons for not signing the release were not made known to Gentry or anyone else at CGE or CapGemini America. As Judge Buchmeyer stated in the TXU case, the "critical underlying assumption" (which was missing from the evidentiary record) of the needed causal link is that TXU was aware of Reilly's intent to allege discrimination claims against TXU. *Reilly,* 2006 WL 2586816 at *14. Because Reilly did not inform anyone of this intent, no causal

15

connection could be established, and the third prong of his *prima facie* case also failed. *Id.* at *15.

The same holds true in this case. When the record is considered in the light most favorable to Reilly, and the court assumes that Gentry (plus various members of CGE's human resources staff) knew that he had not executed the TXU release, but that no one at CGE or CapGemini America knew why he did not sign it, Reilly cannot raise a material issue of fact regarding whether there was a causal connection between his failure to sign the release and his termination. *Id.; see also Croushorn,* 518 F. Supp. at 22 (where employer is unaware of plaintiff's intent to pursue protected activity until after plaintiff's discharge, discharge cannot be motivated by desire to retaliate). For this reason, and for reasons of collateral estoppel (as discussed more fully above), Reilly has failed to raise a genuine issue of material fact regarding the third element of his *prima facie* case.

### 2.     Defendants' Legitimate, Non-Retaliatory Reason

If Reilly had set forth sufficient evidence to establish his *prima facie* case of retaliation, which he has not, the burden of production would then shift to Defendants to articulate a legitimate, non-retaliatory reason for the decision to terminate Reilly's employment. *Grizzle,* 14 F.3d at 267, *citing Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 42 (5th Cir. 1992). Defendants have presented competent summary judgment evidence that Reilly was selected for layoff in CGE's first round of reductions because he was ranked near the bottom of the list of employees in his department, and because CGE was no longer performing the strategic sourcing function for TXU. Therefore, the court finds

that Defendants have satisfied their burden of presenting a legitimate, non-retaliatory reason for Reilly's discharge.

### 3. Pretext

The final element of Reilly's retaliation claim is that he must set forth sufficient evidence raising a genuine issue of material fact whether his termination was actually a pretext for retaliation. *Id.* To meet this burden, Reilly must demonstrate that he would have been retained "but for" engaging in protected activity. *Medina v. Ramsey Steel Co.,* 238 F.3d 674, 685 (5th Cir. 2001); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998). While this portion of the analysis may seem identical to the "causal link" step of the prima facie case, the burden here is more stringent. *Medina,* 238 F.3d at 685; *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116-1117 (5th Cir. 1983). To withstand summary judgment, Reilly must reveal "a conflict in the substantial evidence on the ultimate issue of retaliation." *Sherrod,* 132 F.3d at 1122.

Again, Reilly cannot raise a material fact issue on this element of his claim, as it is undisputed that he did not communicate his intent to file a charge of discrimination against TXU until after he had been laid off from CGE. Because Defendants were unaware that Reilly intended to pursue a discrimination claim at the time of the decision to discharge him, Reilly cannot establish that the reasons set forth by Defendants for his selection in the reduction in force are pretextual. *See Mato v. Baldauf,* 267 F.3d 444, 452-53 (5th Cir. 2001), *cert. denied,* 536 U.S. 922 (2002) (reversing jury verdict for employee and finding of pretext on retaliation claim where employee failed to present evidence that

decisionmaker was aware that she helped female co-workers file sexual harassment claims); *Taylor v. Marshall Durbin Food Corp.,* 37 Fed. Appx. 89 (5th Cir. 2002) (plaintiff presented no evidence that company was aware of her EEOC charge, thus a reasonable juror could not infer that her termination resulted from retaliatory animus); *Lewis v. Gillette, Co.,* 22 F.3d 22, 24 (1st Cir. 1994) ("[a]t a minimum," employee must provide competent evidence that alleged retaliators knew of the employee's protected activity"). For all of the above reasons, Defendants are entitled to summary judgment on Reilly's retaliation claims.

### C. Dual Employer Issues

In addition to moving for summary judgment on the merits of Reilly's claims, CapGemini America also alleges that it should not be liable to Reilly because it was not Reilly's employer. Because the court has determined that Defendants shall be granted summary judgment on the substance of Reilly's claims, it need not reach this issue.

### IV. Conclusion

For the reasons stated by the court herein, Defendants' Motion for Summary Judgment is **granted,** and Reilly's claims are hereby **dismissed with prejudice.** Judgment will be entered by separate document.

**SO ORDERED.**

Signed March 28th, 2007.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE

18